507 A.2d 857

Thomas M. D'AURIA, Appellant,

v.

ZURICH INSURANCE COMPANY, Hartford Insurance Company, Argonaut Insurance Company, Pennsylvania Medical Society Insurance Company, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 12, 1985.

Filed April 7, 1986.

232

---

Wendelynne J. Newton, Pittsburgh, for appellant.

James A. Beinkemper, Sr., Pittsburgh, for Hartford, appellee.

Kenneth J. Nolan, Pittsburgh, for Argonaut, appellee.

Mark Neff, Washington, for Pa. Med., appellee.

Before CAVANAUGH, JOHNSON and WATKINS, JJ.

CAVANAUGH, Judge:

Dr. Thomas M. D'Auria appeals from the order of August 30, 1984 entered in the Court of Common Pleas of Fayette County denying his motion for summary judgment and entering judgment in favor of appellees.[1] The sole question in this appeal is whether three insurance companies had a duty to defend the appellant in a malpractice suit filed against him. We hold they did not.

In 1981, Dr. D'Auria, who practiced pediatric medicine in Uniontown, Pennsylvania, was sued for malpractice by a former patient, Mr. Gregory Egnot. Egnot was a patient of Dr. D'Auria's from the time of his birth in 1957 until 1963. In Egnot's complaint against Dr. D'Auria, he alleged that D'Auria was negligent and careless both during and after the time he was D'Auria's patient and avers that this negligence was a cause of the renal failure he suffered in 1979.

Each of the three insurance companies involved in this dispute did not insure appellant until long after he treated Egnot. Hartford insured him from 7/22/73 to 7/22/76. Argonaut insured him from 7/22/76 to 1/1/78. PMSLIC insured him from 1/1/78 to 6/30/82. All three provided "occurrence" type policies. "An 'occurrence' policy protects the policyholder from liability for any act done while the policy is in effect, whereas a 'claims made' policy protects the holder only against claims made during the life of the policy." *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531 n. 3, 98 S.Ct. 2923 n. 3, 57 L.Ed.2d 932 (1978). According to appellant, all three policies stated:

"[T]he company shall have the right and duty to defend any suit against the insured seeking such damages, even if any of the allegations of the suit are groundless, false or fraudulent...."

[1] The duty to defend is separate from and greater than the duty to indemnify. *Pacific Indem. Co. v. Linn*, 590

---

1. The rights of the other appellee, Zurich Insurance Company, are not affected by our decision, and we need not include it in our discussion.

F.Supp. 643 (E.D.Pa.1984) *aff'd.* 766 F.2d 754 (3d Cir.1985). In purchasing insurance, the appellant here purchased not only the insurer's duty to indemnify when claims which fall within the policy's coverage are successful, but also protection against those groundless, false or fraudulent claims *regardless* of the insurer's ultimate liability to pay. *Zeitz v. Zurich General Accident & Liability Ins. Co.,* 165 Pa.Super. 295, 67 A.2d 742 (1949). Not all claims asserted against an insured, however, activate the insurer's duty to defend. In analyzing whether the insurer has a duty to defend, we must first look to the complaint filed against the insured. *St. Paul Surplus Lines Ins. Co. v. 1401 Dixons,* 582 F.Supp. 865 (E.D.Pa.1984). "It is not the actual details of the injury, but the nature of the claim which determines whether the insurer is required to defend." *Springfield Tp. et al. v. Indemnity Ins. Co. of North America,* 361 Pa. 461, 64 A.2d 761 (1949). *See also Vale Chemical Company v. Hartford Acc. & Indem.,* 340 Pa.Super. 896, 490 A.2d 896 (1985). *East Coast Equipment Co. v. Maryland Casualty Co.,* 207 Pa.Super. 383, 218 A.2d 91 (1966). After discerning the facts alleged in the complaint, we then must decide whether, if those facts were found to be true, the policy would provide coverage. If it would, then there is a duty to defend. The much quoted language of Judge Learned Hand clearly delineates the well-settled principle.

> "[I]f the plaintiff's complaint against the insured alleged facts which would have supported a recovery covered by the policy, it was the duty of the defendant to undertake the defence, until it could confine the claim to a recovery that the policy did not cover."

*Lee v. Aetna Casualty & Surety Company,* 178 F.2d 750, 752 (2d Cir.1949). *See also Cadwallader v. New Amsterdam Casualty Co.,* 396 Pa. 582, 152 A.2d 484 (1959). If the factual allegations of the complaint on its face states a claim to which the policy *potentially* applies, the insurer must defend. *Pacific Indem. Co. v. Linn, supra; Brugnoli v. United Nat. Ins. Co.,* 284 Pa.Super. 511, 426 A.2d 164

(1981); *Gedeon v. State Farm Mutual Automobile Ins. Co.*, 410 Pa. 55, 188 A.2d 320 (1963); and *Seaboard Industries, Inc. v. Monaco*, 258 Pa.Super. 170, 392 A.2d 738 (1978).

 Even though the insurance policy states that the insurer must defend against allegations which are groundless, false, or fraudulent, this does not mean that the insurer has a duty to defend *any* suit filed against the insured. The duty to defend is limited only to those claims *covered by the policy. Warner v. Employers' Liability Assurance Corporation*, 390 Pa. 62, 133 A.2d 231 (1957); *Wilson v. Maryland Casualty Company*, 377 Pa. 588, 105 A.2d 304 (1954). Thus, the insurer owes a duty to defend if the complaint against the insured alleges facts which would bring the claim within the policy's coverage if they were true. It does not matter if in reality the facts are completely groundless, false or fraudulent. It is the face of the complaint and not the truth of the facts alleged therein which determines whether there is a duty to defend. *See Warner v. Employers' Liability Assurance Corporation, supra; Wilson v. Maryland Casualty Company, supra.*

In the instant case, Egnot's complaint against the doctor alleged that when the doctor treated him from 1957 to 1963, he was negligent or careless in failing to diagnose and have treated a medical condition that was a consequence "of a lower urinary tract obstruction secondary to posterior urethral valves." [2] This kidney condition was surgically treated in December of 1962 or January of 1963 by another physician. After 1963, Egnot was never again treated by D'Auria. Egnot experienced renal failure in March of 1979. He attributes the cause of his renal failure to 1) D'Auria's failure to diagnose and have treated the aforementioned condition which was eventually treated by surgery in December of 1962 or January of 1963, and 2) appellant's failure to provide appropriate follow-up care and treatment

2. Egnot also alleged that another doctor's negligence was also a cause of his renal failure. This allegation is not pertinent to our discussion.

after Egnot's release from the hospital in January, 1963.[3] The complaint states: "As a combination of the foregoing occurrences, Plaintiff suffered loss of renal tissue which results in renal failure, which loss of renal tissue could have been avoided or minimized if Plaintiff had received appropriate diagnosis, care and treatment throughout the course of his renal condition."

We must determine if the facts alleged on the face of the complaint state a claim which is covered by any of the three policies. If so, there is a duty to defend. Because these policies were "occurrence" policies, we must decide whether the facts allege an "occurrence" that falls within any of the policies' coverages.

We will refer to and rely upon occurrence cases which deal with *indemnity*. We believe that these cases may be appropriately used in a *duty to defend* context. The major difference between indemnity and duty to defend cases is that in the latter, the complaint is the sole guide to the facts. As such, we shall use the complaint as our sole guide. The "time of the occurrence" has spawned numerous reported decisions and a fair amount of confusion. *See* Annot., 37 A.L.R. 4th 382 (1985). We find no Pennsylvania state court decision directly on point, but have sought guidance from well-reasoned opinions in other courts.

In determining whether the facts allege an "occurrence" that falls within any of the three policies' coverages, we must ascertain what is the "occurrence" alleged, and when it happened. The three insurance policies at issue insured Dr. D'Auria from 7/22/73 to 6/30/82. If an "occurrence" is alleged to fall anywhere within that time period, one or more of the insurance companies has a duty to defend.

■ We must first determine how many "occurrences" are present in Egnot's complaint. "The general rule is that an occurrence is determined by the cause or causes of the resulting injury. '[T]he majority of jurisdictions employes

3. It is unclear whether Dr. D'Auria treated Egnot after his release from the hospital. Dr. D'Auria did not treat Egnot after 1963.

[sic] the 'cause theory'. .... Using this analysis, the court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.' ' " *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir.1982). In *Appalachian*, an employer adopted certain employment policies in 1965 which, according to several female employees, discriminated against women over the next several years. The court of appeals affirmed the lower court and held that despite the fact that there were multiple injuries of different magnitudes which extended over a period of time, there was but one occurrence. "The injuries for which [the employer] was liable all resulted from a common source: [the employer's] discriminatory employment policies." We adopt the "cause of the loss" test in the instant case to determine the number of "occurrences" present in Mr. Egnot's complaint.

■ Even if completely true, we find that Egnot's complaint alleges only one occurrence. The cause of Mr. Egnot's alleged renal failure was the alleged mistreatment of his condition by Dr. D'Auria. We note that the complaint superficially states two causes for the renal failure: 1) Dr. D'Auria's pre-1963 failure to diagnose and have treated the condition that was eventually treated in January 1963, and 2) his post-1963 failure to adequately follow up and care for Egnot. Nevertheless, we believe that the substance of the complaint alleges only *one* cause. The complaint indicates that the doctor mishandled Egnot's treatment in not diagnosing or acting quickly enough to treat the condition that contributed to the renal failure, and also in not recognizing the severity of that condition and treating it accordingly. We do not think that it is appropriate to examine the doctor's alleged mishandling of a case in minutia in order to single out individual instances of want of care and to label them as separate "causes". Nor do we think it appropriate to label the doctor's failure to follow-up on a misdiagnosed case *after* the patient has left his care as a separate and distinct cause of an injury which later befalls the former patient. Appellant alleges that the three policies cover

injuries which arise out of the *failure* to render professional services. This does not alter our conclusion. Mr. Egnot left Dr. D'Auria's care in 1963 and developed renal failure in 1979. We believe that if the doctor's neglect was a cause of Egnot's renal failure, it would be because of his mishandling and misdiagnosis of the case *while Egnot was a patient of his.* The commonly accepted nature of the practice of medicine commends this result. In every instance in which a doctor mistreats a patient, whether by misdiagnosis or other negligence, the patient may leave the doctor's care only to later experience consequent injury and losses due to the mistreatment. In such a case, it would forsake common sense to say that there are multiple causes of the injury, the mistreatment *and* the doctor's repeated failure to follow up. Certainly, one trained in medicine might possess the acumen to single out myriad mistakes in a doctor's treatment of a patient and to label each as a "cause" of resulting injury. We believe, however, that to divide the doctor's mistreatment into multiple causes here would be an artificial and arbitrary division. The substance of Egnot's complaint alleges one cause, Dr. D'Auria's mistreatment of his renal condition.

Having determined that there was one "occurrence", we must now determine *when* it took place. An occurrence happens when the injurious effects of the negligent act *first manifest themselves* in a way that would put a reasonable person on notice of injury. In *Appalachian Ins. Co. v. Liberty Mut. Ins. Co., supra,* the court stated that "[w]hile the 'cause' test is appropriate for determining whether there is a single occurrence or multiple occurrences, it is not applicable in determining when an occurrence takes place. We hold that the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." *Id.* at 61–62. The party alleging the negligence need not have actually *discovered* the injurious effects at the time they first manifested themselves. *See e.g., Silver Eagle Co. v. National Union Fire Ins. Co.,* 246 Or. 398, 423 P.2d 944, 40

A.L.R.3d 1432 (1967). The court in *Eagle-Picher Industries, Inc. v. Liberty Mut. Ins.*, 682 F.2d 12 (1st Cir.1982) *cert. den.* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 held that an "occurrence during the policy period" takes place when both the accident *and the resulting injury* occur in the policy period, but that actual medical diagnosis is not necessary. The court noted that although actual diagnosis of the disease would promote certainty and ensure that coverage is easily ascertainable, it found that the policy language in question required that exposure to asbestos result in bodily injury during the policy period, *not* that it be medically diagnosed. In *Transamerica Insurance Company v. Bellefonte Insurance Company*, 490 F.Supp. 935 (E.D.Pa.1980), the court found two separate "occurrences". In that case, drugs were ingested by pregnant women during the time insurer A insured the drug manufacturer, and deformed children were born during the time insurer B provided coverage. In deciding when the injuries occurred, the court held that it was reasonable to conclude that the *injuries to the children* certainly occurred while they were still in the womb, and insurer A was liable for *their* damages. On the other hand, the *parents' damages*, including increased medical and child rearing expenses resulting from the births plus the emotional trauma caused by the births, occurred only at the time of the children's births and so insurer B was liable for these damages. Thus, an "occurrence" happens when *injury* is reasonably apparent, *not* at the time the *cause* of the injury occurs. The cause and the injury may happen at very distinct time periods.

In *Gulf v. Dolan, Fertig, and Curtis,* —— Fla. ——, 433 So.2d 512, 37 A.L.R.4th 373 (1983), the court wrote: "An occurrence policy is a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Id.* at ——, 433 So.2d at 513. And, "[o]ccurrence policies are built around an insurer who is liable for the insured's malpractice, no matter when discovered, so long as the malpractice occurred within the

confines of the policy period.... The occurrence insurer, then, is faced with a 'tail' that extends beyond the policy period itself." *Id.* at ——, 433 So.2d at 515.

■ Turning to the instant case, we must decide at what point in time the injurious effects of the doctor's negligence first manifested themselves in a way that could be ascertained by reasonable diligence. We hold that the effects of the negligence first manifested themselves prior to the coverage periods of any of the three policies. Therefore, none of the appellee insurance companies had a duty to defend.

Mr. Egnot's complaint avers that his renal failure in 1979 was the culmination of ongoing renal deterioration which should have been diagnosed in 1963. While he does not aver that *total* renal failure was apparent in 1963, we nevertheless believe that, according to Egnot's complaint, the injury due to the doctor's negligence was first manifested in a way that could be ascertained by reasonable diligence well before any of the three policies took effect in 1973. The allegation of ongoing renal deterioration which should have been diagnosed and treated in 1963 seems to us to be a definite injury.

Decisions from other courts indicate that an "occurrence" cannot happen until the injury or damage is irremediable. *See e.g., Bartholomew v. Insurance Company of North America,* 502 F.Supp. 246 (D.R.I.1980) *Aff'd.* 655 F.2d 27 (1st Cir.1981). In the instant case, Egnot's injury appears to have been definite in 1963 and, although it would continually worsen, it appears to us to be a sufficient manifestation of injury to satisfy the test of an occurrence. We can see no reason in waiting to pinpoint the time of the "occurrence" until such time as ultimate injury becomes a certain proposition.

Moreover, we think that as a matter of policy, the three appellee insurance companies should not be forced to defend for an injury which was, at least in embryonic form, reasonably apparent thirteen years before any of them

undertook to provide occurrence coverage. "[A]n insured cannot insure against something which has already begun." *Appalachian Insurance Co. v. Liberty Mut. Insurance Co., supra.*

Judgment affirmed.